1
2
3
4
5
6           IN THE UNITED STATES DISTRICT COURT
7             FOR THE DISTRICT OF ARIZONA
8
9   United States of America,          )   CR 06-775-PHX-MHM
                                        )
10          Plaintiff,                  )   **ORDER**
                                        )
11   vs.                                )
                                        )
12                                      )
     Shawnell Shya Kasey;               )
13   Antonio Roy James,                 )
                                        )
14          Defendants.                 )
                                        )
15  _____ )

16

17

18          Presently pending before the Court is Defendant Shawnell Shya Kasey's Motion to

19   Suppress her statements taken on June 8, 2006 (Doc. 52).  The government has filed a

20   Response (Doc. 54).  The Court held a Voluntariness Hearing on December 12, 2006.  After

21   considering the papers, the oral argument, and the evidence presented, the Court hereby

     issues the following Order.
22
                                    BACKGROUND
23
            Defendant was arrested on tribal charges in connection with the stabbing death of
24
     Santana Paxson that allegedly took place on or about June 7, 2006 on the White Mountain
25
     Apache Reservation in Arizona.  On June 8, 2006, Defendant was interviewed by Special
26
     Agents James H. Rominger, Raymond Duncan Jr., and White Mountain Apache Detective
27
     Perphilia Massey.   Most of the interview was tape recorded.   However, there is
28

1   approximately twenty minutes of the interview that was not tape recorded and is "off the
2   record" at the Defendant's request.  During the interview, Defendant confessed to the murder
3   of Santana Paxson.   Defendant Kasey and Co-Defendant Antonio Roy James were
4   subsequently charged with murder.  Defendant now moves this Court to suppress the
5   statements she made during that interview.

6          The June 8, 2006 interrogation began at approximately 1:09 p.m.  Initially, Defendant
7   was advised of her <u>Miranda</u> rights.  She responded affirmatively when asked if she
8   understood her rights.  When the agents asked Defendant if she was willing to waive her
9   rights to talk with the agents, Defendant replied, "Is that a good thing or a bad thing?"  Agent
10  Rominger advised Defendant that "It's completely up to you."  Agent Rominger advised
11  Defendant that if she talked with the agents it would allow her side of the story to "come
12  out."   Agent Rominger then asked Defendant again if she wished to waive her rights.
13  Defendant stated that she did wish to waive her rights.  Agent Rominger told Defendant that
14  if, at any time during the interview, she became uncomfortable, she could stop the interview.
15  Defendant then signed the waiver of rights form (<u>See</u> Exh. 1).

16         During the interview, Defendant asserted that she was not with the other suspects but
17  instead had babysat for a cousin.  The agents told Defendant that her story did not comport
18  with the other suspects' stories.  The agents told Defendant that this was a serious matter; that
19  she would face greater consequences if she lied as opposed to simply not answering the
20  question; and that there was a huge amount of evidence against her.  The agents also asked
21  Defendant to consent to providing a DNA sample using a buccal swab.  Defendant agreed.

22         Defendant asserts that she attempted to invoke her right to remain silent at least six
23  times.  The testimony that Defendant asserts were attempts to invoke her right to remain
24  silent are as follows.  First, when SA Rominger offered Defendant an "opportunity to tell
25  [her] side of the story" and offering the Defendant the opportunity to tell why she had acted
26  the way she had, Defendant responded by saying "I just can't say."  June 6, 2006 Interview
27  Transcript ("IT") at 8-9.  Next, when SA Duncan asked the Defendant if she wanted to tell
28  her side if the story because it may differ from the story the others had told, Defendant

1   responded by saying, "[s]o they already told you, huh? Well, then you can get it from them."

2   IT at 11.  Third, when SA Rominger asked the Defendant if she wanted people to hear what

3   happened, Defendant responded by saying "[n]o."  IT at 12.  Fourth, when SA Rominger

4   asked the Defendant about Santana and what had happened to her, Defendant responded by

5   stating, "I don't know about her."  IT at 13-14.  Fifth, when both SA Rominger and SA

6   Duncan asked the Defendant if the others who were interviewed were more "stand up" than

7   the Defendant, Defendant responded by stating, "I guess so."  IT at 14-15.  Finally, when SA

8   Rominger asked the Defendant if she wanted her side of the story to come out, Defendant

9   responded by stating, "[o]bviously, you got enough there."  IT at 15.

10                                              LEGAL STANDARD

11          The burden is on the government to show that a defendant was aware of her rights and

12   that she waived them.  United States v. Cazares, 121 F.3d 1241, 1244 (9th Cir.1997).  In

13   order for a confession obtained during a custodial interrogation to be admissible, any waiver

14   of a defendant's Miranda rights must be voluntary, knowing, and intelligent.  United States

15   v. Vallejo, 237 F.3d 1008, 1014 (9th Cir. 2001)(citing Miranda v. Arizona, 384 U.S. 436, 479

16   (1966)).

17          The government has the burden to prove that a statement was voluntary by a

18   preponderance of the evidence.  United States v. Bautista, 362 F.3d 584, 589 (9th Cir. 2004).

19   "In evaluating voluntariness, the test is whether, considering the totality of the circumstances,

20   the government obtained the statement by physical or psychological coercion or by improper

21   inducement so that the suspect's will was overborne."  Bautista, 362 F.3d at 589 (internal

22   citation omitted).  In considering the totality of the circumstances, factors to consider include

23   the presence of any police coercion, the length of the interrogation, its location and its

24   continuity, whether the police advised the suspect of her rights, and whether there were any

25   direct or implied promises of a benefit.  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir.

26   2003).  To be knowing and intelligent, "the waiver must have been made with a full

27   awareness of both the nature of the right being abandoned and the consequences of the

28   decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 421 (1986).  "In short the true test

                                              - 3 -

1  of admissibility is that the confession is made freely, voluntarily, and without compulsion or

2  inducement of any sort."  <u>Haynes v. State of Washington</u>, 373 U.S. 503, 513-14 (1963).

3        "Coercive police activity is a necessary predicate to the finding that a confession is

4  not 'voluntary' within the meaning of the Due Process clause of the Fourteenth Amendment

5  . . ." <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).  "Where the record lacks evidence of

6  either physical or psychological coercion by law enforcement officials, the defendant's

7  mental capacity is irrelevant to the due process inquiry into the voluntariness of the

8  confession."  <u>United States v. Chischilly</u>, 30 F.3d 1144, 1151 (9th Cir. 1994).

9                                    DISCUSSION

10  I.      INVOCATION OF RIGHTS

11        The words used to invoke one's <u>Miranda</u> rights are to be "understood as ordinary

12  people would understand them. <u>Connecticut v. Barrett</u>, 479 U.S. 523, 529 (1987). Defendant

13  was advised of her rights and she agreed to waive them by signing a written waiver.

14  (<u>See</u> Exh. 1.)  As stated above, during the June 8, 2006 interview, Defendant made remarks

15  such as "I just can't say"; "Well you can get it from them"; "No" (in response to a question

16  whether she wanted her side of the story to be herd by everybody); "I don't know about her";

17  "I guess so"; and "Obviously you got enough there."  Defendant's statements that she now

18  claims were an attempt to invoke her right to remain silent are ambiguous at best. At no point

19  during the interview did Defendant state that she wished to remain silent or that she no longer

20  wanted to speak with the agents.  Even when the agents told Defendant that it was better to

21  state that she was not going to answer the question than it was to lie, Defendant did not

22  indicate that she wanted the interview terminated.  Nor did Defendant indicate that she was

23  done talking and wished to remain silent, even when she requested that the agents turn off

24  the tape recorder.  Moreover, a number of times during the interview, the agents reminded

25  Defendant that she could terminate the interview if that was her wish.  Thus, the Court finds

26  that no ordinary person would have understood Defendant's statements to indicate that her

27  comments were made in an effort to invoke her right to remain silent.

28  II.      PROMISES OF LENIENCY

                                    - 4 -

Defendant asserts that the agents made promises of benefits or leniency if Defendant talked with them.  During the interview the agents made the following statements that Defendant alleges were promises of leniency:

(1)    SA Rominger:    . . . You can help yourself out by telling the truth. By standing up and telling the truth and accepting what you did.  Acceptance of responsibility and cooperation with the Government, so that they can see that and they can help make their decision on how to handle this case.

IT at 8.

(2)    SA Rominger:    . . . [T]his is probably going to be a 50-year-to-life-type count.

You know you need to mitigate, try to help yourself out. . . .

IT at 12.

(3)    SA Duncan:    We're giving everybody the same opportunity.

SA Rominger:    And they'll give the benefit for standing up. Because that's the way the Federal system works for cooperation with the Government.  That's the way it works.  You get the benefits for doing that. It shows a truthfulness.  Whether the truth hurts, you get a benefit for the truth, and the truth can hurt.  It's not fun talking about this kind of stuff.

IT at 15.

(4)    SA Rominger:    . . . You just need to make a decision if you want to do something like that to explain to the world why this went down.  But it's up to you.  I mean, this is to help you.  It's not going to help me, I don't need the help.

. . . They're young like you are.  They are trying to do whatever they can to rectify a bad situation and make it in their best interest, and I would do the same thing.

> And these aren't all the people that are there either. I mean, there's other people.  We got the blue truck, and that's all being processed.  We got this – – There's just a huge amount of evidence and when we work with the Apache Detectives and us, that's the kind of cases we put together.  And they're very thorough, very solid. So you're young, you need to do something that's going to help you out.

IT 19-20.

> (5)    SA Rominger:    The time is 1:53, and it was asked to turn off because Shya needed time to think, and she was concerned about the others that are involved in this and she wants to see what she can do to assist them, so that they don't face as harsh a time. She is now willing to talk to help those other people out. . . .

IT at 21.

A promise to recommend leniency is insufficient to establish the involuntariness of a statement.  United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988).  A promise only vitiates consent if it is "sufficiently compelling to overbear the suspect's will in light of all attendant circumstances."  Id. at 1366. Reciting possible penalties or sentences does not render a statement involuntary.  United States v. Haswood, 350 F.3d 1024, 1029 (9th Cir. 2003).

Here, the agents told Defendant that she could help herself by telling her version of the events.  There is nothing in the interview transcript to indicate that the agents said or did anything to overbear Defendant's will.  Merely stating that Defendant should "help herself by telling her story" is not sufficiently compelling to overbearing her will by offers of leniency.  Furthermore, Defendant states that she confessed to prevent others, who had nothing to do with the murders, from being charged.  At no point in the interview did Defendant indicate that she confessed because the agents promised leniency or that her confession was in exchange for a lighter sentence.  Nor do the agents state that they are

offering Defendant a lesser sentence in exchange for her confession.  Finally, the agents'

recital of possible prison sentences does not render Defendant's statement involuntary.

III.    THREATS

Defendant contends that her statement is involuntary because the agents threatened

to arrest her family; specifically, Defendant's grandmother who raised her.  There was a

period of time in which the tape recorder was turned off and the discussion was "off the

record."  When the tape recorder was turned on again, Defendant stated was as follows:

| Defendant: | . . . You guys wanted a confession you got one. You got one now.  Leave everybody alone.  Don't ever mention my grandma's name again to me too.  Don't ever mention her name.  She's the only reason why I'm doing this.  You mention her name to me.  I love her so much. |
| | |
| | We've been through so much together.  Just leave my grandma.  Nobody was never there, nobody.  Just me and my grandma.  I never had a father, and I never had a mother . . . Now it's just me and my grandma.  Nobody – – the only reason why I'm telling you this is because you mentioned my grandma' name.  Don't ever mention my grandma's name against. |
| | |
| | You want a confession, you got it.  You got.  You leave those people alone. |
| SA Rominger: | Okay. |
| Defendant: | Leave them alone. |
| SA Rominger: | So none of them – – none of the other ones had anything to do with it? |

IT at 21-24.

Threats to arrest a suspect's family may constitute impermissible coercion that may

render a resulting confession involuntary.  United States v. Moreno, 891 F.2d 247 (9th Cir.

- 7 -

1  1989).  As stated above, a confession violates due process if an agent's threats overbear a

2  defendant's will at the time of the confession.  <u>Haynes</u>, 373 U.S. at 513-14.

3          In this case, the Defendant requested that the agent turn off the tape recorder.  When

4  the recorder was turned back on, Defendant talked about the need to leave her family

5  members alone.  However, it is unclear why, at that point, Defendant talks about the need for

6  the agents to leave her grandmother alone.  There is no indication in the transcript that the

7  agents threatened Defendant's family members.  Nor does the Defendant state that she is

8  confessing because the agents threatened her family while the tape was off.  In fact, the

9  transcript indicates that the agents told Defendant that they did not believe her family

10  members were involved.  (<u>See</u> IT 17-18, 55, 56.)  Furthermore, Agent Rominger testified at

11  the December 12, 2006 Voluntariness Hearing that no one threatened the Defendant or her

12  family during the time the tape recorder was turned off.  (<u>See</u> Suppression Hearing Transcript

13  17:25-18:3.)  Therefore, the Court does not find that the Defendant's will was overborne by

14  threats at the time she confessed.

15  IV.   MISREPRESENTATION OF STRENGTH OF EVIDENCE

16          The Defendant asserts that the agents misrepresented the strength of their case in an

17  effort to coerce a confession from her.  As evidence, Defendant submits the following

18  transcript excerpts:

19          (1)   SA Rominger:   Plus, it allows you to make sure your story
20                              is recorded in case these are different than
                                what your story is. Now, these people have
21                              all said the exact same thing, so it's all the
22                              same story.  So I assume that yours will
                                match theirs, but that's what this is up to.
23                              So it's up to you.

24  IT at 4.

25          (2)   SA Rominger:   Because I can tell you every detail of that
26                              night.  Times, everything, and you need to
                                decide whether you want to tell the truth or
27                              whether you don't.  And honestly, it doesn't
28                              make any difference because the DNA, the

1    testimony, all this stuff is all going to play
2    out. Every crime scene, everything that we
3    went through, pulling out your clothes out
     of the fire pit, everything is there.

4  IT at 7.

5         (3)   SA Rominger:   But obviously, you know what I'm talking
6                               about, and you know that I know
7                               everything.  I mean, I can go into every
                                detail and every facet of this case.

8               SA Duncan:     These are all witness statements of
9                               everybody that was there with you that
10                              night. Any they're all telling us yeah, Jazzy
11                              left, saying that you were there and what
12                              you did.  And like Jay said, this is your
                                chance to tell your side of the story.  You
                                did it for a reason.
13 IT at 10.
14

15        (4)   SA Duncan:     Down the road, there's going to be a day
16                              when you go to court on this, if you decide
17                              to take it that far.  There's going to be seven
18                              people that are going to testify and tell the
                                truth and you're going to be hanging our
19                              there all by yourself with this lie that you
                                just told us.
20              SA Rominger:   That you weren't anywhere there.

21              SA Duncan:     And there is a jury and they take a look at
22                              everybody and they decide who's telling the
23                              truth.  I don't know about you, but seven
24                              people that tell the exact same story is more
                                believable than one person that they all say
25                              is there, but just refusing to admit what they
                                did.
26 IT at 15-16.

27        (5)   SA Rominger:   And these aren't all the people that are there
28                              either. I mean, there's other people. We got

1    the blue truck, and that's all being
2    processed. We got this – – There's just a
     huge amount of evidence.
3
     IT at 20.
4
5        Trickery, or deceit does not render a statement involuntary unless the agents make

6    threats or promises.  United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2004).

7
         As the First Circuit has noted, 'trickery is not automatically coercion. Indeed,
8        the police commonly engage in such ruses as suggesting to a suspect that a
9        confederate has just confessed or that police have or will secure physical
         evidence against the suspect. While the line between ruse and coercion is
10       sometimes blurred, confessions procured by deceits have been held voluntary
         in a number of situations.'
11
12       United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998); see also United
         States v. Orso, 266 F.3d 1030, 1039 (9th Cir. 2001) (en banc) (holding that an
13       inspector's misrepresentation that a piece of evidence existed, while
14       reprehensible, does not constitute coercive conduct); Clanton v. Cooper, 129
         F.3d 1147, 1158 (10th Cir. 1997) (holding that a confession was voluntary
15       despite the fact that an officer falsely told the defendant that physical evidence
         connected him to the crime).
16
17   Id.

18       In the instant case, the agents had other participants' statements about what happened

19   the night of the alleged crime.  In seems that all evidence that the agents alleged to have

20   gathered, they, in fact, had gathered.  From the evidence presented, it appears that the agents

21   made no misrepresentations to the Defendant about the strength of their case against her.

22                                CONCLUSION

23       The Court finds that the Defendant knowingly, intelligently, and voluntarily confessed

24   to the alleged murder.  There is insufficient evidence to show that Defendant was overborne

25   by promises of leniency.  There is insufficient evidence to show that the agents threatened

26   to arrest Defendant's family if she did not confess.  Considering the totality of the

27   circumstances, it appears by a preponderance of the evidence that the government did not

28   overbear Defendant's will but, instead, Defendant confessed voluntarily.

1

**Accordingly,**

2

**IT IS ORDERED** that Defendant's Motion to Suppress (Doc. 52) is denied.

3

DATED this 14th day of February, 2007.

4

5

6

7

8

_____
Mary H. Murguia
United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28